I see you have one tomorrow as well, is that true? Yes. You know, in the future you might want to call the clerk and see if you can get them on the same day. That's a liable. I'd love the opportunity if everybody stayed in at least a day in a row. Well, we actually could set them the same day, but you might want to let the clerk know. Well, just to let you know, we talked about it with the clerk this morning when I noticed it, and if that would happen again, you might want to give the clerk a call and see if you can get them on the same day. I understand. Thank you, Judge. Okay. All right. Would you like to begin, then? Yes, Judge. Good afternoon, judges, counsel. Your Honor, my name is Liz Noren, and I'm with Defendant Theresa Poff in Shelbyville, Illinois. And we represent a gentleman by the name of Mr. Harold Smedley, and we filed this appeal asking that the trial court's ruling be overturned. My opposing counsel represents a gentleman, excuse me, a woman named Mary Cottrell. She is an heir of this estate as well as the executrix of this estate. The third heir is a gentleman named Charles Smedley. Interestingly enough, he's not here today, and he's not been involved in this appeal, but he was the heir that filed the motion for clarification. And those are the three heirs of the estate of Mr. Mark Smedley. Mark Smedley is deceased, and he died with no spouse and no children. So his siblings, that being Mary, Harold, and Charles, are the three heirs of this estate. Let me ask you a question first, right off the bat. Are any of the people involved in this appeal arguing the provision or the order that said that Mark disinherited Charles and Mary? Are any of them arguing that that's in? They said there was no disinheritment. Correct. Is anyone saying that that's incorrect? In other words, Mark intended to disinherit Charles and Harold as set forth in that article of his will. No, Judge, I'm looking at the will now. I believe, I hate to speak for counsel, but I believe that the record will show that all of the parties, and again, I don't want to speak for opposing counsel at least. Let's ask you, and then I'll ask them. Sure. I know that myself and Charles, the underlying movement in this case, believe that that provision is not a disinheritance. On behalf of the people who were allegedly disinherited. Right. Correct. What a shock. But anyway, go ahead. I'm looking for that provision now. Okay. And the reason, Judge, and actually the trial court agreed with us, article 6, which you're referring to, the conclusion, which supported our argument at the trial court level, is that that was not a disinheritance. And that was actually fully briefed before the court. We discussed that with the court, because what we're saying is that there's no specific provision for Harold and Charles. And the reason, of course, that we believe that that's not a disinheritance is because when you look at article 3, it specifically makes a specific bequest to heirs. And the only heirs that are allowed to take on article 3 are Harold and Charles. Because there's a condition of precedent for Mary Cottrell, the remaining heir, is able to take on article 3. So if you considered article 6 as a disinheritance, article 3 would have no meaning. So are you saying Mary can't inherit under article 3? That's our position, Judge, because there's a condition of precedent before she's allowed. Article 3 specifically states that the farm property and residence in Rosamond, Illinois, will go to whatever heir commits to reside, maintain, and repair the home and the farm property. And that Mary will take it only in the event that no heir commits, makes that commitment. It's a condition of precedent. If there's a dispute, then Mary gets to choose. Correct. So if it's Mary, Harold, and Charles, and they all want to take the property, then Mary gets to choose, even though she might be one of the ones in trouble, right? Well, our position in this case, and that's, I think, the fifth issue up on appeal today, is that Mary should not – our article 3 should not be interpreted to allow Mary to be one of those heirs to take. Number one, because there's a condition of precedent that specifically states that she takes only if no heir is willing to commit, reside, repair, et cetera. And number two, if she's allowed to take and she's also the tiebreaker, so to speak, then Article 3 is a no-win. Maybe it was the intention of the testator that if no one else wanted it, she had to take it. I think it was. I think it specifically says that if no heir commits, then Mary is going to have it. Right. Correct. I believe that that is true. That would mean that she couldn't choose to throw her hat in the ring to get it. I think she would have the ability to auction it if she wanted. I think what we're saying is the way it's written is such heirs as will take care. Why isn't she a such heir? She's ultimately going to get to decide, so if she decides for herself, you know, it's like – And that's the thing. It's a nullity. If the intent of the testator was for Mary to be able to have that property, then why wouldn't the testator have said Mary's going to get the property? Instead, it said I want my heirs who are willing to commit to reside in, and if there's no one that's going to do it, then it goes to Mary. Or if my heirs have a disagreement, then Mary will decide which one of my heirs will receive it, not that Mary will decide whether or not she wants it. I think that if we're going to interpret this will to meet the intent of the testator, it doesn't make any sense. And, again, it makes Article 3, a nullity and a condition precedent a non-event in the event that we say Mary gets everything. It doesn't make any sense. It may be at least ambiguous. I think so. Was there any parole evidence introduced in the trial court about what the intent of the testator was in that regard? I think the evidence that any – what you consider parole evidence would be the fact that my client was the person who had farmed the 25 acres, contiguous, and surrounding the residential 3.49 homestead and is currently under a long-term lease, I think, of like 10 years. In addition, of course, you have the evidence that shows that Munn's Inc., which, of course, was dissolved by the Executrix pursuant to an agreed partition action, was owned in thirds with my client, Mary Cottrell, the Executrix, and an heir in addition to the deceased, Mark. They own that together, that property. But Mary was left Mark's interest in Munn's Inc., correct? Correct. And then there was a partition suit, or at least the company was dissolved in the Christian County case? Correct. Now, as a result of that settlement, the 25 acres you're talking about that Harold was farming? That Harold was farming. 25 contiguous acres? That's correct. Harold didn't take ownership of that. He took ownership of the Dunkle Farm and the Findlay Farm. Correct. Part of the partition action resulted in an agreement, and the agreement was that as it relates to the 25 acres that is in Rosamond, Illinois and surrounds the home, it was one-third, one-third, one-third, and as a result of the resolution, Mark received a half. Thereby, the state received 50%, and Mary lost her interest from one-third to 50%, and in return, Harold received the Findlay Farm. And the Dunkle Farm. I believe that's correct, yes. And what they did is they, of course, valued the properties and made a distribution that they thought was fair, but it's important to note that Mary's interest did bump from a third to 50%, and the court ruled correctly that that was after acquired property. Why did it? I couldn't understand why that happened. It should have gone to 66 and a third percent, Mary's. Mary's interest in Munn's Inc., because she was left Mark's interest, Mark had a third. She should have owned two-thirds of that 25 acres. And she chose as the executrix, Judge, it's a critical point. She chose as the executrix to, instead of doing that, to dissolve Munn's Inc. in that partition action and allow an agreement to be entered into, she, on behalf of the estate, that Mark's estate would receive a 50% interest and she would receive 50%, in return for which Harold didn't receive those other farms. So they did an evaluation of all this farm ground, and that's what they believed was fair and reasonable, and that agreement was entered in that Janitory Court case. And so when they looked at all these farms, that's what was agreed. And so what happens is there was nothing to be passed in through the Munn's Inc. provision, which I believe is Article 4. There's nothing to pass. And the court has found correctly that that 25 acres is now after acquired property to be distributed within the estate of Mark. And that's absolutely critical because those 25 acres are farm property in Rosamond, Illinois. But we have to look at Mark's intent at the time he drafted the will. At the time Mark drafted the will, he knew that he was giving a third of Munn's Inc. to Mary. Correct. So at the time he drafted the will, which was December 18, 1995, it would have been his, at least apparent, intention that two-thirds of Munn's would now be owned by Mary, which means Mary would own two-thirds of the 25 acres and two-thirds of the Findlay farm. Correct, with his brother, Harold, who had farmed it. With Harold, a third. With my client, Harold. Right. Right, who had farmed the property for an extensive period of time and continued to farm it in a long-term lease. That's exactly right, Judge. But now there's nothing in Munn's Inc. And now there can't be a co-ownership pursuant to Article 4. But how does it pass under Article 3 if, at the time the will was written, the intent was to pass it directly to Mary, but his interest in Munn's? Right, I understand that, Judge. But the problem is that he understood at the time of executing his will that his interest was going to Mary because his brother, who, again, had farmed this ground the majority of his life, was going to be a co-owner of the 25 acres with his sister. And now that's gone. And now that's gone. So just like any after-acquired property, we don't know what he thought at the time of the will execution, which is why the law states you look at the date of death at the time these data is probated regarding the after-acquired property. And we will point you to the cases of Capasso, for instance. In that situation, you had someone who transferred specific lots outlined in his will. And he then, after he executed his will, acquired an additional property. What did the court say? I think the court said it refers to the Supreme Court case of Eckhart as well. You attempt to transfer after-acquired property through specific bequests at all possible. There's a presumption that we are to pass it through a specific bequest so long as we're able to interpret it broadly enough to do so. In this case, Article III specifically says all farm property at Roseland, Illinois. If we ignore the farm property at Roseland, Illinois, and try to transfer it through the residuary clause, Article III is of no meaning. Well, this property wasn't acquired after he executed the will but before his death. It was acquired after his death. Correct. And the trial court ruled that that is going to be considered after-acquired property. And we think that that was an appropriate finding. It is an interesting situation when you think about it, but you can't give a windfall to the executrix. She made a conscious decision to enter into that agreement in an unrelated partition action while the estate was pending and to take more than her one-third. She took 50 percent interest as a result of that agreement, and as the executrix for Marks Estate, she allowed him to take 50 percent as well. Wasn't this all approved by the court? In the Chancery Court case, unrelated to the probate. Well, I understand, but, I mean, she couldn't have just done all these things without some kind of court approval. Oh, absolutely. All three of them signed off on it. It wasn't even contested. Right. My point, though, is if you give her 100 percent, the 25 acres through the residuary clause, she's receiving a windfall. So, are you arguing that, I've got your first argument, that Mary can't take on the Article 3s, but now you're arguing that Harold and Charles would take the 50 percent interest under Article 3 of the 25 contiguous acres. Whichever heir, which would be Charles and Harold, pursuant to Article 3, would be filing an acceptance  Okay. Okay, let me just, now, I thought I understood this, but now I'm confused. The 25 acres was not in his estate at the time of his death. That's correct. It was in his estate as a piece of property owned by MUNZ Inc. MUNZ Inc. Owned by MUNZ Inc. Correct. Right, right. But your argument is you want to attach that 25 acres to the, whatever it was, 3.94 acres where his residence was, arguing that his intent at the time he executed the will, or for that matter at the time of his death, when it wasn't even in his name that he meant to include that farm property. Yes, Judge, because the circumstances changed so dramatically. At the time of his death, he would have never anticipated that Mary would receive 100 percent of the 25 acres that was also owned by MUNZ Inc. They were partners. All three siblings were partners. His anticipation was that his sister would continue to partner with his brother. Again, the brother, the only brother that farmed the 25 acres. Well, if he couldn't have anticipated that, how could it have been his intent? Well, Judge, it's after a part of the property, so unfortunately. So this is just a legal construct. We're not really talking about the testator's intent here. I think we have to always look at the testator's intent. I think that's the first place to look. If it's ambiguous, then at that point we look at additional factors. But for Mary to enter into this settlement on behalf of MUNZ, this property would have never come into this estate. It would have been hers and Harold's. That's exactly right. Outside of these. That's exactly right, and she made a choice in the unrelated chancer partition action. The fact that she makes a choice, how does that become the testator's intent? Well, it's not that it's the intent. It's that she made that choice as the executrix to remove the property from MUNZ. And I think it is important to understand that that is not before this Court. The trial court has ruled that no one has appealed the finding that those 25 acres are to be considered after acquired property not to be passed under Article IV of the MUNZ progression. So the question is, does it pass through Article III or the residuary? And our position is it cannot possibly pass through the residuary. That makes no sense. Article III specifically states farm property in Rosamond, Illinois. And, again, if it's after acquired property, the time the executor has ruled, the testator had no idea that this circumstance was going to arise, but it has arisen. Let me ask you something else before you get run out of time.  And the 240 acres that were inherited from Aunt Edith, those are in Rosamond, Illinois, right? They have a common 9-1-1 address of Rosamond, Illinois. And as you know, with rural property, there has to be a common address, and that is their 9-1-1 common address. And they transfer to two counties, is that right? Correct, Christian and Montgomery. There are six parcels. So that's right. It's the 240 acres. Even though they're Montgomery and Christian, their rural address is Rosamond, Illinois. Correct. Their 9-1-1 address. That's what the evidence of trial was. Their 40-acre piece is a little bit separated from the 200 acres. The 200 acres are within a few miles of the residence. The 3.49 lot is literally continuously surrounded around the 25 acres. The only farm property with the home, literally with the home, touching the home, is the 25 acres. The other property is just a few miles rural and outside of city limits with a common 9-1-1 address of Rosamond, Illinois. And five of the parcels are located in Rosamond then, and one parcel is immediately south. That is correct. But still is connected and has a 9-1-1 address of Rosamond. It's all one track. Well, the 40 acres is not continuous. The 40 acres is, I think, maybe there's one lot in between the two of them. The 200 is all continuous together. And it all has the 9-1-1 common address of Rosamond, Illinois. And it is confusing. It was confusing at the trial court level as well. But I think it's critical for us to understand. You're going to hear the appellee argue that that's not the case because they look at the real estate tax bills. But we all know that the real estate tax bill goes to whoever's paying the taxes, not the address. The 9-1-1 address was a Rosamond, Illinois address. Well, what about this 40-acre parcel? Where is that? In Montgomery? In Montgomery County. Yes, Judge. And our belief and position is that the testator's intent was for his farm property in Rosamond, Illinois, to go past through Article 3. The homestead that we're discussing that he lived in was the family homestead. They lived there as children. It was very important to him. It was kind of like, you know, what I own is farm property. If you maintain it, you take care of it, then I'm going to let you have that farm property, and I'm going to let you have the home. So I think that's important to understand. And that really was the underlying intent. He didn't know what he was going to do. Well, actually, I think he did. The family settlement agreement that was entered into for Smithley's estate was entered into one year before he executed his will. And he knew that this was the Rosamond family farm. That's what everybody knew. They were all from Rosamond, Illinois. It's the Rosamond family farm property. And so at the time that he executed his will, he knew that he was going to be inheriting one-fourth interest in this family farm. And that's what happened. If he wanted Mary Petrell to receive all of his interest in the Rosamond family farm, he would have said that. But he didn't. MUNZ, Inc. What was the business of MUNZ, Inc.? Was it a farming corporation? Correct. Family farming corporation? Yes, Judge. Okay. And so MUNZ, Inc. owned this 25 acres. Along with two other farms. And farmed it. That's correct, Judge. Family farm. That's correct. Well, at the time of Mark Smedley's death, he knew about the family settlement, which was entered into in January of 1995. Correct. He knew he was going to get a fourth of Aunt Edith's 240 acres. That's right, Judge. His will was executed in December of 1995. So almost a year. December, 1995. That's correct. Almost a year after the family settlement agreement, which he was present for. So if your position is the 240 acres should pass through Article III, again, you're saying that Mary Petrell wouldn't be entitled to any of that. No, Judge. But if you look at the will, she received substantial other assets of the testator. His personal property, etc. And she also, of course, has her own one-fourth interest. Well, let's suppose that Harold and Charles fight over who's going to take care of the property. Then Mary gets it. Mary chooses. She only gets it if the condition of precedent is met. And that is where no other heir wants it. And the two heirs in this case are his two brothers. If one of his brothers pre-deceased him, he'd be dealing with nephews. But they didn't. So the heirs are the two brothers. That's what's there. And Harold has filed his acceptance. He's the only. Correct. He's the only one of those two. I saw Mary file a court's order. She did. Charles, who's not represented here, is he working the farm? Is that my understanding? He's not working the 25 acres. He does farm. But is Mary paying him to work the farm? I believe she is. But I'm going to let counsel issue that for certainty. And is the reason that Charles hasn't filed is because there's an appeal, or does Charles not intend to file? There has been nothing in the record to show that he has any interest whatsoever in taking. None. To maintain it and do everything required. Correct. My client's committed himself to do that. He said, I will move in. I'm going to take care of this. I'm going to take care of the farm, the homestead. It's a huge amount of work. And what is the reason that Mary's given this to him, saying no? Say it again, please. Mary said no when he said give me the keys. Harold said give me the keys when Mary said no. Why? No reason. She filed a motion to strike the acceptance and then withdrew it. We are prepared to argue it. There's been no reason given that I know. I will tell you that I'm subsequent counsel to the case. My father handled it whenever the initial requests were made. There were two or three letters in the file showing we're ready to accept, we commit, we want to take on Article III. No response, no keys turned over, a motion to strike, and then they withdrew it. So I think that we just cannot ignore, on this final thought, we cannot ignore Article III. We cannot ignore a condition precedent. And most importantly, if the will says that farm property rights in Illinois goes through Article III, then how on earth can we have Article III interpreted with no farm property? It makes no sense. Thank you, Judge. Thank you. Mr. Binkler? What is it? How do you pronounce your name, sir? James O. Beavers. Beavers, okay. Somebody addressed me as Mr. O. Beavers the other day. I'm not far behind. You will have to speak up, though. I'm from Taylor, Illinois, and I represent the executor of the estate of Martin Smith. I have for a long time. Mark, at the time he wrote his will, owned one-third interest in Munzee, and he owned the Grosvenor property, 3.49 acres as part of his discussion, and he also owned a third interest in the Dunkle Farm at that time. After he wrote that will, he acquired an interest in Sanford, acquired property, named it 25 acres out of that shuffle of Munzee and this other thing, and also a fourth interest of 240 acres. Well, he knew he was going to get that fourth interest, though. I think he did, yes. And Edith actually died one month before he did, correct? That's correct. The issue, it seems to me here, centers on Article III and what Smith, when he wrote this article that says, I give all my right, title, and interest in my residential and farm property, not properties, property at Grosvenor, Illinois, to such one of my heirs as is willing to commit to reside and maintain, repair, and improve the property. I take that to mean, we understand that to mean 3.49 acres. Mark had acquired that property at 3.49 acres from his mother a couple years before. He lived with his mother on that property for a long time. It was a family homestead for 40 to 50 years, and he was very fond of that property, had a lot of sentimental value, and I think that explains why he put this article in here, 3, requiring somebody to maintain that after he's dead, gone. Do you believe that Mary is one of those heirs that can commit? Or do you believe that Mary is excluded, as Ms. Norris argued? No, Mary's one of the heirs who should have been. Yeah, but is she one of those heirs, like Harold and Charles, who have the right to come in and say, I'll take care of it? Yes, correct. She did that. She has done that? She did that. How did she do that? If I understand your question, she did it as an acceptance of this property. She did it maybe once or two after Harold had done it, but the judge determined that this was not one of those first in time, first in right. I thought that Harold was like 2010 and Mary came in after the order was entered. I mean, there's a substantial amount of time between Harold's acceptance and Mary's, isn't there? I'm not certain about that. Okay. But all she's done is accept the will. She accepted the will, she accepted the residence, 3.49 acres. I might mention also that it's 3.49 acres. You say the residence, the farm property, this residence took up maybe a fourth of that or less. The other three acres contained farm buildings, barns, sheds, lodges, dog houses, loafing sheds. What's a loafing shed? I'm just curious. I saw that in the brief. They had cows back in those days. They had cows back in those days and fed them and they loafed in those sheds. Okay. Just wondering. That's what I figured. Take it at face value. That brief intent has a position that the residence, the farm property, and only that 3.49 acres did not mean they have to acquire the property. It could just mean that the article must be so broad. We have a case concerning that, the Osborne case, that says it must provide the terms and saying is sufficiently broad as shown in the interest that all the property owned shall pass under this will. Well, there's nothing in Article 3 that indicates there's anything other than that 3.49 acres. We believe that that had to have acquired the property. It fell under the residual clause under Article 5. And we also believe that Harold Markson Kent indicated that he intended for his sister Mary to benefit primarily from this estate. I think the reference that you made back there in Article 6, something that I made, that I made no provision for my brother Harold Smithley, Charles Smithley, descendants of Charles, the reason is not necessary to reside here. Frankly, Mark did not like this people. If you, over several years, there's no reasonable justification to believe now that Harold would come in here and benefit substantially from this estate, probably to the exclusion of his sister Mary. Mr. Beavers, why would Mary put half of the 25 acres back into the estate if she was just going to inherit it anyway? Or there would be a fight created on the inheritance. Why just not take it as she could have done? I mean, why would you throw it into a hornet's nest, so to speak? I can't answer that. But if the will was that clear, if she was so clear that she was going to get the property anyway, why throw it into the estate? It's hard for me to understand that. I mean, she was making a deal with Harold. When the Munce company was dissolved, and that was not until 2011, she could have taken the entire 25 contiguous acres for herself because she owned two-thirds of the company. Instead, she makes a decision to put 50% of that back into the estate. So my question is, if it's so clear that she was entitled to half of the 25 acres, why is she putting it back into the estate? Why throw it into what is a hornet's nest as opposed to just taking it? I was involved in those transactions and the dissolution of Munzeen. I remember back then there was a lot of pushing and shoving the negotiations and dissolving the corporation. A lot of feuding with Harold. I think that probably she just didn't think that through. Was she represented by counsel? Well, no. She was not represented by counsel. I represent this corporation and have worked with the attorney, Harold's attorney, in reaching an agreement about who is to get wanted in the dissolution. The buyout. Mark, Steve, $300,000 or $400,000 is his part in giving up his input. You can dump them in, I think, Finley Farm, which Harold wound up with a whole load. Mary wound up with Hill Farm. This thing just fell through the cracks, is my belief. I also want to say that the idea that 25 acres is all surrounded in hoaxes, 3.49 acres is not true. It's adjacent to it. And the other property, the 240 acres is separated by about half a mile. It's outside the small village of Roseland. It's just a little bird there. It has its own boundaries. The 240 acres, the last part of it is separated by about half a mile. It's a mile to the other end of it. The 40 acres is eight miles away. It may have a 911 address, but it has its own address by numbers. Are they in Roseland, Illinois? Yes. So they are. It is farm property. Would you call the 240 acres farm property? I'd call it farm land, not farm property. Farm land. But you don't call it farm lands, do you? No, I think generally people refer to it as farm land. Or farm property. Because it contains six parcels. And I think one of the arguments in this case is you should have used the word properties as opposed to property. And that's just not the usual and customary practice. I mean, farmers may have six, eight, ten parcels, and they'll call it, as you did, farm land and mean more than one parcel, right? That's correct. Okay. Mark here was, at that time, he wrote his will, his ticket to Roseland, and he intended to include those buildings out there as part of the residential property. Sure. That's all he had. Sure, but if he says, on all my farm property in Roseland, Illinois, the 240 acres would be farm property in Roseland, Illinois, or not? I would agree with that, but that's not what he said. You wouldn't have to agree, did you say? Yes. I don't know what his intent was then. Help us with that. Well, my general knowledge, I've been a practice lawyer for 50 years. I've got about 500 wills. And the way it was held was people think about properties. And I think at that time, when we thought about the Roseland property, we thought about that house that you love and the acres around it. And I'm sure he would not intend ever in any way to manage to benefit his brother Harold. Mark did not intend to do that. Mark and Mary were close friends. Any other interpretation other than what this trial judge decided in that case, contrary to all facts? I believe I'm done here. Okay. Do you have any questions? Justice Blank? Justice Blank? No. Okay. Thank you so much. Rebecca? Thank you all. Thank you. Your Honor, we have to decide, Your Honors, we have to decide what is farm property. And I'm not going to spend any time talking about the plural versus the singular because it sounds like from the Court's comments that you understand that the common uses of the term property, and we've cited a couple of cases in particular, is not for it to be used in a plural sense, but it's used in a singular sense every day. And I think it's important for us to note that Article III, he could have said my residence. My residence and my outbuildings, but he didn't. He said all of my farm property. When he signed that will, Mark Smedley knew because 9 or 10, 11 months prior, he had a family meeting. He knew he was going to inherit property from his Aunt Edith. He didn't know when Aunt Edith was going to die, so it wouldn't have been reasonable for him to put in his will when I inherited Aunt Edith's interest. In my one quarter interest in the 240 family Rosamond Farm, I wanted to go to this person. Instead, he said all of my farm property, my residence and all of my farm property. We have to pay attention to the all and to the and. These words are very, very important. They were chosen in Article III. Would he have inherited a fourth interest in the 240 acres if he had predeceased her? No, I do not believe so. Then he didn't know. He didn't own it at the time he wrote the will? He didn't know that he'd outlive her? He knew, Judge, that he was entitled to receive one-fourth if he survived Aunt Edith. My point is that it wouldn't have been appropriate for him to say, when I receive Aunt Edith's, when I receive my one-fourth interest. But he knew that he was going to receive an interest in that property so long as he survived Aunt Edith, which he did by a month. Even if he predeceased her, that went for Starkey's, didn't it? I don't recall, Judge. But he had no children though, right? Excuse me? Mark had no children. No children, no wife. That's true. And so I think that it's critical that we have to look at the terminology in Article III. We also have to look, again, I point us to the Supreme Court in the Eppert case. The question of how or when title was acquired to real estate is immaterial. That's a quote. If the terms of the will can be broad enough to include after acquired property, that is the presumption under Illinois law. We are to transfer that property through the specific request and not the residuary provision. That is what all of our law says, and that's what we're asking this court to do. I think that it's important for us to know when Judge Paisley in the trial court ruled that the property, the 25 acres, literally surrounds this residence. When he said, I'm going to transfer that as after acquired property, which is correct. But then he said, and I'm going to transfer it under the residuary. When he said that, that was the error. It cannot transfer through the residuary under any interpretation of this will. It has to transfer through Article III. It's farm property at Rosamond, Illinois. Once he's determined it's after acquired property, his presumption is to find a way to transfer it through a specific request, and absolutely can we do that. Yes, it says all my residence and all my interest in farm property at Rosamond, Illinois, and that's exactly what it is. That's why you all didn't file the motion to construe will, because we didn't think that Article III needed to be construed. And going further, we're looking at that 240 acres. Again, that was a family farm at Rosamond, Illinois, by counsel's concession. That's the Rosamond farm. That is the Rosamond farm. How can that pass through the residuary? That passes through Article III. All my farm property at Rosamond, Illinois, and that is exactly what we have. But Mark only owns 50% interest, or the estate, actually, has 50% interest in that 25 acres. That's true. He does right now. That is what's subject to be transferred. Maybe you can answer the question. If Mary was to get all of that, why did she throw it back in the estate? Because she had made a good deal, Judge. What's not being said here, which counsel pointed on, and that response to your other question about who was involved as counsel, I respectfully disagree with Mr. Beavers' recollection of the Chancery Court case. Mary Trout was very much represented by counsel in that case. In fact, I hand-delivered the settlement documents to Mr. Beavers' daughter, Beth Rutherton, who was a partner at his law office. And what happened, Judge, is money changed hands along with property. I don't have the details, but I can tell you that the stack was large. It was heavily negotiated. And she did just fine in that settlement. Again, she was represented by counsel. They looked at valuations. They looked at formulas. Harold received this. Mary received that. Mark's estate received the other pot, so to speak. But it was money and property, and that's how that case was resolved. And, again, I don't think that we can ignore when you look at the federal issue, which is pretty much a case of first impression. This is a very interesting issue. When you have a will that says that there can be an acceptance, if you have that, and you have a situation where you have more than one person to file acceptances, this wasn't necessarily an issue at the time of our immediate time of our trial. May I finish? Because at that time, my client was the only client that filed an acceptance. But after the court's order, Mary filed an acceptance. So then the question is, which acceptance should be chosen, the one that was filed over three years ago or the one that was filed immediately after the order was entered in the case? And we're asking this court to enter a ruling that in that kind of a situation has to be a reasonable period of time. And in this case, that would be Harold. Okay. Thank you so much. Thank you very much. Have a good evening. Thank you. This matter will be taken under advisement in an opinion election or trial.